# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **BARBARA J. STAHL,** | |
| **Plaintiff,** | **No. 13 CV 0752** |
| **v.** | **Magistrate Judge Mary M. Rowland** |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,**[1] | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Barbara J. Stahl filed this action seeking review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq, 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a motion for summary judgment. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 25(d).

2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standards for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Stahl applied for DIB and SSI on July 28, 2011, alleging that she became disabled on June 3, 2010, due to depression, anxiety, diabetes, high blood pressure, and degenerative disc disease. (R. at 17, 20, 217). The applications were denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.*). On July 26, 2012, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 17, 46–81). The ALJ also heard testimony from Aimee Mowery, a vocational expert (VE), and Mary Fahy, Stahl's sister. (*Id.*).

After the hearing, the ALJ admitted two exhibits that, due to "error," had not been "exhibited before the hearing." (R. at 17). Stahl then requested a supplemental hearing, which was held on August 21, 2012. (R. at 17, 40–45). Stahl's counsel appeared at the supplemental hearing. (*Id.*).

The ALJ denied Stahl's request for benefits on August 30, 2012. (R. at 17–34). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity from June 3, 2010, the alleged onset date. (*Id.* at 19). At step two, the ALJ found that Plaintiff's major depressive disorder, alcohol abuse, anxiety disorder, diabetes with neuropathy, and degenerative disc disease of the cervical spine are severe impairments. (*Id.* at 20). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 20–23).

The ALJ then assessed Stahl's residual functional capacity (RFC),[3] determining that she has the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except that:

> [Stahl] is able to lift and or carry 20 pounds occasionally and 10 pounds frequently; she is able to stand and or walk for six hours in an eight hour workday; she is able to sit for six hours in an eight hour workday; she can never climb ladders, ropes or scaffolds; she can frequently climb ramps or stairs; she can frequently but not continuously use upper extremities for fine and gross manipulation; she may have no more than occasional concentrated exposure to hazards such as dangerous, moving machinery or unprotected heights; she lacks the combination of concentration, persistence and pace necessary to engage in detailed work for extended periods, but she would be able to perform simple, routine, repetitive work on a consistent basis; she may occasionally be required to interact with co-workers and she may occasionally have brief and superficial contact with the public; she may occasionally set goals or make plans independently of others.

(R. at 23). At step 4, the ALJ determined that Stahl was unable to perform any past relevant work. (*Id.* at 32). At step 5, based upon Stahl's age, education, work experience, and RFC, and the VE's testimony, the ALJ determined that there were jobs existing in significant numbers in the national economy that Stahl could perform, including ticket taker, recreation attendant, and mail clerk. (*Id.* at 33–34). Accordingly, the ALJ concluded that Stahl was not disabled, as defined by the Act. (*Id.* at 34).

On December 10, 2012, the Appeals Council denied Stahl's request for review. (R. at 1–3). Stahl now seeks judicial review of the ALJ's decision, which stands as

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from

the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

### A. Pre-Hearing Medical Evidence

On July 30, 2010, Stahl went to the emergency room, complaining of bilateral foot pain. (R. at 282). She stated that she had been having the pain intermittently for the preceding four to five months. (*Id.*). The records indicate that Stahl was comfortable, alert, and oriented. (*Id.*). The hospital discharged Stahl with a prescription for Norco. (*Id.* at 289).

On February 21, 2011, Stahl went to Holy Cross Hospital Emergency Room, complaining of a "burning pain" in both feet. (R. at 308). She said she could "barely walk" but ranked her pain as 2/10. (*Id*). In addition, she reported a history of twice-monthly alcohol use. (*Id.*). The results of her physical examination were within normal limits. (*Id*).

Outpatient reports from Holy Cross indicate that, on June 13, 2011, Stahl sought a medication refill but did not report any pain. (R. at 307). Stahl sought further refills on August 12, 2011, at which time she complained of neuropathy and reported that her foot pain was 4/10. (*Id.* at 306).

On August 21, 2011, Stahl returned to Holy Cross Emergency Room complaining of foot pain with swelling and anxiety. (R. at 439). Dr. Flores diagnosed her with anxiety disorder. (*Id.* at 439, 441). A musculoskeletal exam revealed normal range of motion, normal strength, no tenderness, no swelling, and no deformity. (*Id.* at 422). She was found to be alert and "oriented to person, place, time, and situation." She also had "no acute distress." (*Id.*).

On August 25, 2011, Stahl had an appointment at the psychiatric outpatient unit of Holy Cross with Dr. Regina Hall-Ngorima. (R. at 418, 450). Stahl reported that her anxiety had become worse over the preceding two years, with her social anxiety worsening over the last year. (*Id.*). In addition, she reported a head tremor that prevents her from "going to the doctor, getting her hair done, [and] going on job interviews." (*Id.*). Her appetite was stable but decreased. (*Id.*). She had "[a]dequate energy" and "[n]o psychotic symptoms or manic symptoms." (*Id.*). Stahl reported that, once per week, she drinks six to seven beers. (*Id.*). Dr. Hall-Ngorima found Stahl to be "very tearful" with "poor grooming," but also "logical and linear," with no delusions or hallucinations. (*Id.* at 419, 450). Dr. Hall-Ngorima diagnosed Stahl with depression and anxiety with a need to rule out social phobia at a later appointment. (*Id.*).

On November 15, 2011, Stahl reported that the clonazepam she was taking several times per week gave her no side effects. (*Id.*). Dr. Hall-Ngorima diagnosed her with major depressive disorder. (*Id.*). On November 25, Dr. Hall-Ngorima found Stahl to be depressed, anxious, "very tearful," and poorly groomed. (*Id.* at 448).

Stahl saw Dr. Hall-Ngorima again several months later, on February 2, 2012. (*Id.* at 442). She was unaccompanied to the appointment. (*Id.*). Once again, Stahl indicated that her medication caused no side effects. (*Id.*). Dr. Hall-Ngorima diagnosed a recurrent episode of major depressive disorder, but noted that Stahl's "course" was "improving." (*Id.* at 445).

On November 28, 2011, Stahl was examined by Dr. Priya Pillai, a doctor with a practice in family medicine. (R. at 275–76). Dr. Pillai stated that Stahl has "severe" anxiety and depression and that Stahl is only occasionally able to reach, handle, finger, or feel. (*Id.* at 275). Dr. Pillai also opined that, depending on the severity of the pain, Stahl would only occasionally or never be able to push or pull with her hands or feet. (*Id.*).

On February 3, 2012, Dr. Hall-Ngorima provided information to the Township of Worth regarding Stahl's "Application for General Assistance." (R. at 390). The doctor opined that Stahl was not able to work "due to [the] severity of [her] social phobia," which "ke[pt] her from leaving the home." (*Id.*). The doctor added that she expected Stahl's condition to last for 12 months or more. (*Id.*).

On March 28, 2012, Stahl started treating with Dr. Fahmeeda Begum. (R. at 431). Dr. Begum diagnosed neuropathy and vitamin deficiency. (*Id.* at 434). She also indicated that Stahl had "[n]o response to treatment." (*Id.*).

On April 30, 2012, Stahl saw Dr. Maria Elena Gragasin, complaining of burning pain in her hands and feet "for about 2 years." (R. at 426). She denied having recurrent neck or low back pain but claimed to have low back pain on the day of the ap-

pointment. (*Id.*). Stahl reported that her medication (gabapentin) was not helping her. (*Id.*). Dr. Gragasin diagnosed probable peripheral neuropathy, with alcohol being a potential contributing factor. (*Id.* at 428). The doctor advised Stahl to "stop drinking alcohol." (*Id.*). A physical examination revealed hypoesthesia in both upper and both lower extremities, but indicated normal muscle strength and tone. (*Id.* at 427).

On July 12, 2012, Stahl saw Dr. Gragasin for a follow-up visit, "for burning pain in hands and feet." (R. at 468). Although Stahl had started taking Lyrica, the medication was not helping her much. (*Id.*). Stahl also complained of cramps and "heaviness of legs." Although she reported almost constant neck pain for several years that radiated to her extremities, she denied any neck and low back pain during her visit. (*Id.*) Dr. Gragasin diagnosed chronic neck pain, chronic low back pain, and peripheral neuropathy. (*Id.* at 469).

On July 24, 2012, Stahl underwent a CT scan of her lumbar and cervical spine. (R. at 461, 463). The scan revealed no fractures, compression deformities, or misalignments, but it did show "[m]ild narrowing of the left foramen" due to bony hypertrophy at both the L3-L4 level and the L4-L5 level. (*Id.* at 463). While Stahl's right foramen and disks were normal at the L3-L4 level, she had "[n]arrowing of the right foramen at the L5-S1 level due to bony hypertrophy projecting from the disks and also from the facet joint." (*Id.* at 463–64). The scan also showed "[s]ome central bulging of the disk" at the L5-S1 level," but there was no "significant stenosis." (*Id.* at 464). The cervical scan revealed no fractures, compression deformities or misa-

lignments, but it did show "[d]egenerative disk or joint changes throughout much of the cervical spine with some mild impingement upon the left foramen at the C2-C3 level." (*Id.* at 462). The C3-C4 level was normal, but the "C4-C5 showed bilateral foraminal narrowing, left much greater than right." (*Id.*). Bilateral narrowing was noted at the C5-C6 level, "quite severe on the left side." (*Id.*). Finally, at the C6-C7 level, "changes arc bilateral but [are] more marked on the right side due to bony hypertrophy projecting from the disk and from the facet joint." (R. at 462). In addition, the scan revealed "no obvious disk herniation." (*Id.*). However, Stahl had "osteophytes projecting from the disks at the C6 and C7 levels." (*Id.*).

On July 26, 2012, Stahl again saw Dr. Hall-Ngorima, who noted that Stahl was "depressed and anxious." (R. at 457, 459). Dr. Hall-Ngorima diagnosed major depressive disorder and social phobia, and opined that Stahl's condition was "[w]orsening." (*Id.* at 459).

## B. Stahl's Hearing Testimony

At the hearing, Stahl testified that she has diabetes, which prevents her from working. (R. at 51). She has neuropathy in her feet, legs, and hands, and is unable to provide childcare, which had been her job for the previous 15 years. (*Id.* at 51–52). When Stahl was asked to provide specifics as to why she was unable to provide childcare, she answered "hand manipulation." (*Id.* at 52). She is unable to change diapers due to severe pain in her hand. (*Id.*). She is also unable to pick up, feed, or run after the children. (*Id.* at 63). Naproxen had helped her somewhat, but doctors took her off the drug because it caused "kidney failure." (*Id.* at 52).

Stahl testified that she would be unable to be on her feet for more than one-third of an 8-hour workday. (R. at 63). Her feet swell; her doctors have told her to stay off of and elevate her feet until the swelling subsides. (*Id.* at 63–64). For as much as seven hours a day, she places her feet up on the end of a couch. (*Id.* at 64). Often, however, the swelling does not subside and is "continually there." (*Id.*). She experienced foot pain during the hearing that she described as 8/10. (*Id.* at 55). Her foot pain becomes "progressively worse" and "more stabbing" at night. (*Id.* at 56). As for "data entry" work, Stahl does not have sufficient dexterity, and her hands are "too painful" and "crippled up at times." (*Id.* at 63). She stated that she would be unable to use her hands for data entry for more than one-third of an 8-hour workday. (*Id.*). Stahl also testified that she is unable to lift and carry much weight. (*Id.* at 57). She cannot lift a gallon of milk or pour herself a glass of milk. (*Id.*). Due to pain in her hands, she also has difficulty opening milk cartons and plastic jugs. (*Id.*).

Stahl has blurred vision and has some difficulty reading. (R. at 65). In addition, she has daily headaches that last for several hours and cause nausea. (*Id.*). While she has not yet seen a neurologist regarding the headaches, on the day before the hearing, Stahl waited at a neurologist's office for several hours but was unable to see a doctor. (*Id.* at 65–66). Stahl also described a "head tremor," during which her head shakes in an "embarrassing" way. (*Id.* at 66). She has had the tremor for "quite a few years" but it is getting worse (*Id.*). The tremor causes pain in her neck and interferes with her ability to read screens. (*Id.* at 67).

Stahl described her medications as "horrible," although she testified that she was taking them as prescribed. (R. at 52, 54, 56). She has experienced side effects from her medications. (*Id.* at 56). In particular, she has trouble remembering everyday things like changing the litter box and feeding her cat. (*Id.* at 56–57). As a result, she writes herself notes. (*Id.* at 56). Stahl tries to eat healthy foods, such as vegetables and fruit, but her medications affect her appetite, and she has to force herself to eat. (*Id.* at 55).

Stahl testified that she does not drink alcohol and she has never been an alcoholic. (R. at 54). She stopped drinking socially in 2009 or 2010. (*Id.*). Prior to that time, she would drink on holidays or when attending weddings. (*Id.*). Doctors have cautioned her not to drink because of her various medications, especially her antidepressants. (*Id.*). However, she did acknowledge having a glass of wine at Christmas. (*Id.* at 60).

Stahl denies having any hobbies or doing anything for fun. (R. at 59). However, she does occasionally undertake a few household chores such as feeding her cats and doing her own laundry. (*Id.*).

Stahl stopped driving in 2010 because using the gas pedal "aggravated" her feet and steering was difficult. (R. at 55). She has pain and stiffness in her hands and does not feel safe driving. (*Id.*). Stahl is able to walk only for 15 or 20 minutes at a time. (*Id.* at 57–58). Afterwards, she returns to the couch to "sit or lay and watch TV." (*Id.* at 62–63). Although she can "sit and lay almost all day," she is able to stand for only a half hour each day, spread throughout the day and "not in one peri-

od." (*Id.* at 57). During the two-year period preceding the hearing, Stahl spent 7 hours lying down in an 8-hour day. (*Id.* at 62).

Stahl testified that she would leave her home "maybe once a week." (R. at 52). On those occasions, Stahl's sister would drive and accompany her to the grocery store. (*Id.* at 52–54). Stahl's sister would drop her off in front of the store. (*Id.* at 54). When using a shopping cart, Stahl would lean against the basket and "scoot" herself throughout the store. (*Id.* at 54, 57). Stahl's sister would bag the groceries and move them in and out of the vehicle. (*Id.* at 54). Once at Stahl's house, Stahl's son would put them away. (*Id.* at 54). Stahl stated that she did not leave her home for any other purpose. (*Id.* at 53). Although Stahl would visit her sister on holidays, she did "not really" get together with others. (*Id.* at 59).

Stahl testified that she is able to use a cellphone but would only call her son and sister. (R. at 58). Although Stahl is able to write a short note with a pen or pencil, at times her writing is very sloppy, "[l]ike a kid writing." (*Id.* at 58–59). As to her clothing, Stahl said that she utilizes a "tie coat" and does not wear coats with zippers. (*Id.* at 60). In addition, most of her shirts are T-shirts, and she wears Velcro shoes and "slip-ons." (*Id.*).

When asked by the ALJ whether she has any problems getting along with others, Stahl responded: "No. No, not really." However, she does feel isolated due to both her mental and physical state. (R. at 60). She is able to interact with people she encounters during doctors' visits and shopping trips. (*Id.* at 60–61).

## C. Mary Fahy's Hearing Testimony

Mary Fahy, Stahl's sister, testified that she lives two blocks away from Stahl's house and sees her sister nearly every day; in some cases, "just to check on her." (R. at 67–70). When Fahy stops by, Stahl would usually be lying or sitting on the couch. (*Id.* at 69). Fahy stated that Stahl lies down for "98 percent" of the time. (*Id.*). Fahy testified that Stahl is a recluse with no friends. (*Id.* at 70).

Fahy testified that she helps Stahl with several household chores, such as cleaning, laundry, and putting groceries away when the two come home from the store. (R. at 68–69). Fahy drives Stahl to the grocery store and to doctors' appointments. (*Id.* at 68). Stahl is nervous and has trouble communicating with others (*Id.* at 70). Although Stahl is able to take the bus when Fahy is unavailable and only if Stahl has been to the destination before, it takes her a long time to walk to the bus stop. (*Id* at 68). Fahy does Stahl's shopping and brings her food whenever Stahl had a neuropathy flare-up. (*Id.* at 70).

Fahy testified that the hearing day was a "good day for [Stahl] with her feet." (R. at 70). But on other days, Stahl is unable to move off of her couch. (*Id.*). Fahy asserted that Stahl's neuropathy flare-ups have been occurring for the last five years, although they had recently gotten worse. (*Id.* at 73). Under regular circumstances, Stahl has flare-ups four days a week. (*Id.* at 71). However, during the winter, they increase to six days a week. (*Id.* at 72). During such flare-ups, Stahl uses crutches and does not go shopping. (*Id.* at 71–72).

### D. Consultative and Nonexamining Physicians

#### 1. Mental Impairments

On September 15, 2011, Dr. Jeffrey Karr, a licensed clinical psychologist, completed a consultative psychological examination of Stahl. (R. at 346–49). Stahl arrived at the appointment unaccompanied and via public transportation. (*Id.* at 346). Stahl reported that she talks to her friends twice every two weeks. (*Id.*). Further, she said she had ceased engaging in various recreational activities six years prior, following the incarceration of her son and the death of the son's father from cancer. (*Id.*). Those events and ongoing health concerns caused Stahl to have insomnia. (*Id.*). Moreover, Stahl reported that she drinks alcohol only on special occasions. (*Id.* at 347). She had most recently drunk one month before the examination, at which time she consumed five beers. (*Id.*).

Stahl presented a prescription for Celexa and Clonzepam, which were apparently unfilled. (R. at 347). Dr. Karr noted that Stahl had seen the prescribing psychiatrist for the first time in August 2011. (*Id.*). Although Stahl showed "no visible signs of physical discomfort or obvious motor difficulties," she "looked exhausted." (*Id.* at 348). Stahl was "eager to talk, without indication of vigilance, withdrawal or interpersonal discomfort." (*Id.*). She was alert and showed no indication of cognitive difficulty, and her "responses were coherent, intelligible, accompanied by appropriate eye contact." (*Id.*). Dr. Kerr found no evidence of "overt oppositional behavior" and no "overt signs of substance usage, gross psychopathology, cognitive difficulty or visible physical distress." (*Id.* at 348–49). However, Stahl was "visibly dysphoric, alleg-

ing multiple depressive symptoms which seems consistent with her presentation for which she has begun mental health treatment recently and is on medication." (*Id.* at 349). Dr. Karr opined that, if Stahl were substance free, she would be "capable of handling funds." (*Id.*).

On October 15, 2011, Dr. Marva Dawkins, a DDS nonexamining physician, completed a psychiatric review technique (PRTF) form. (R. at 364–77). Dr. Dawkins identified "major depressive disorder," "anxiety disorder," and a history of "alcohol abuse" as Stahl's medically determinable impairments. (*Id.* at 367, 369, 372). Dr. Dawkins opined that Stahl was moderately restricted in her activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence and pace. (*Id.* at 374).

Dr. Dawkins also completed a mental RFC assessment. (R. at 452–54). Dr. Dawkins concluded that Stahl was moderately limited in her ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the public; and (5) respond appropriately to changes in the work setting. (*Id.* at 452–53). Otherwise, Dr. Dawkins stated that Stahl was "not significantly limited." (*Id.*).

Overall, Dr. Dawkins opined that Stahl retains the mental capacity to understand, remember, and carry out simple, one- or two-step instructions. (R. at 454). She "should be able to sustain simple, routine tasks and/or activities over the course

of a normal workday and workweek in a work setting where there are not strict production quotas." (*Id.*). Stahl is able to appropriately relate to coworkers and supervisors but would perform best with minimal contact with the public. (*Id.*). Finally, Dr. Dawkins concluded that Stahl "should be able to adapt to the customary demands of a competitive work setting where work related tasks are simple, and/or routine." (*Id.*).

On February 10, 2012, Dr. Donna Hudspeth, a DDS nonexamining physician, completed a PRTF form. (R. at 391–404). Dr. Hudspeth found that Stahl has "disturbance of mood, accompanied by a full or partial manic or depressive syndrome." (*Id.* at 394). Further, Dr. Hudspeth opined that "major depressive disorder" and "alcohol abuse" are Stahl's medically determinable impairments. (*Id.* at 394, 399). Dr. Hudspeth opined that Stahl was mildly restricted in her activities of daily living and in maintaining social functioning, and has moderate difficulties in maintaining concentration, persistence or pace. (*Id.* at 401).

Dr. Hudspeth also completed a mental RFC assessment. (R. at 405–07). Dr. Hudspeth found that Stahl was moderately limited in her ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) interact appropriately with the public; and (4) set realistic goals or make plans independently of others. (*Id.* at 405–06). Otherwise, Dr. Hudspeth concluded that Stahl was "not significantly limited." (*Id.*).

Dr. Hudspeth opined that Stahl abuses alcohol and has not been "compliant with medication." (R. at 407). Stahl is "able to understand, remember and perform at

least simple one and two step tasks in the work environment within physical limitations." (*Id.*). Dr. Hudspeth concluded that Stahl could "communicate with supervisors and fellow employees" but was also "manipulative and should not deal with the public." (*Id.*). In addition, Dr. Hudspeth opined that Stahl would be able to adapt to an ordinary work routine and make work decisions. (*Id.*).

### 2. *Physical Impairments*

On October 11, 2011, Dr. Towfig Arjmand, a DDS nonexamining physician, completed a physical RFC assessment. (R. at 356–63). Dr. Arjmand opined that Stahl was limited to occasionally lifting 20 pounds, frequently lifting 10 pounds, and standing/walking/sitting for 6 hours in an 8-hour workday. (*Id.* at 357). Stahl is able to frequently climb ramps or stairs but cannot climb ladders, ropes, or scaffolds. (*Id.* at 358). Stahl should avoid concentrated exposure to various hazards. (*Id.* at 360). Dr. Arjmand noted that Stahl's complaints of hand and foot pain outweighed the objective evidence, and she has had inconsistent treatment for her neuropathy. (*Id.* at 363). On February 17, 2012, Dr. George Andrews, another DDS nonexamining physician, affirmed Dr. Arjmand's assessment. (*Id.* at 409–11).

## V. DISCUSSION

Stahl raises the following arguments in support of her request for reversal or remand: (1) the ALJ improperly assessed Stahl's credibility; (2) the ALJ improperly rejected the opinions of Stahl's treating physicians; and (3) the ALJ improperly assessed Stahl's RFC. (Dkt. 17).

## A. Credibility

Stahl contends that the ALJ improperly assessed her credibility. (Dkt. 17 at 8). When a claimant alleges subjective symptoms, the ALJ evaluates the credibility of those allegations. Social Security Ruling (SSR) 96-7p.[4] An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). One court within the Seventh Circuit has noted that "[d]emonstrating that a credibility determination is patently wrong 'is a high burden.'" *See Mueller v. Astrue*, 860 F. Supp. 2d 615, 631 (N.D. Ill. 2012) (quoting *Turner v. Astrue*, 390 F. App'x 581, 587 (7th Cir. 2010)).

An ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003) (citation omitted). But because an ALJ is in the best position to observe witnesses, her credibility finding will not be overturned if it has some support in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1178–79 (7th Cir. 2001).

---

[4] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

When assessing the credibility of an individual's statements about symptoms, an ALJ must consider the evidence in light of the entire case record. *See* SSR 96-7p. "This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." *Id.* The ALJ must consider the "individual's daily activities" and the "location, duration, frequency, and intensity of the individual's . . . symptoms." *Id.* Finally, where the individual attends a hearing conducted by an ALJ, the ALJ may also consider his or her own observations of the individual. *Id.*

In this case, the ALJ gave Stahl's allegations "little weight" and discounted her credibility (R. at 30). The ALJ put forth several explanations for this credibility finding, including (1) that Stahl's claims were inconsistent with each other, (2) that Stahl's allegations were contradicted/unsupported by both evidence in the record and observations by the ALJ; and (3) that the record indicated gaps and instances of medication noncompliance in Stahl's treatment history. (R. at 23–31).

Stahl has not met the high burden of demonstrating that the ALJ's credibility determination was patently wrong and not supported by the record. As a preliminary matter, Stahl criticizes the ALJ's use of certain "boilerplate" language,[5] which

---

[5] The language in question consists of the following: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 29–30).

the Seventh Circuit has labeled "meaningless" because it "yields no clue to what weight the [ALJ] gave the testimony" and fails to link conclusory statements with the objective evidence in the record. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir.2012). However, "the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir.2013). Ultimately, boilerplate language can be used as long as the ALJ "sa[ys] more" in support of her credibility finding. *See Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir. 2012).

In this case, despite the use of the boilerplate language, the ALJ *did* otherwise justify her credibility finding. The ALJ's discussion of the related issues of credibility and RFC occupy over seven pages of the administrative record. (R. at 23–31). While the length of an analysis does not necessarily presuppose its depth and quality, here the ALJ provided a detailed account of the relevant medical evidence. Repeatedly, the ALJ described medical evidence and then explicitly noted how the evidence undercut Stahl's credibility or otherwise informed the RFC assessment.

In the decision, the ALJ stated many times that certain of Stahl's allegations were "inconsistent" and "undermine[d] her statements." (R. at 24, 25, 27, 28, 29, 30). SSR 96-7p instructs that the "consistency" of a claimant's statements is a "strong indication of . . . [her] credibility." "Consistency" takes several forms in a social security case. An ALJ must consider the "degree to which the individual's statements are consistent with the medical" evidence, the "consistency of the individual's own

statements," and the "consistency of the individual's statements with other information in the case record." SSR 96-7p.

With respect to Stahl's credibility, the ALJ addressed each manifestation of "consistency." First, the ALJ noted that Stahl's allegations were inconsistent with, and unsupported by, the medical evidence. On July 30, 2010, for instance, Stahl went to the emergency room because of foot pain. (R. at 282). The examination revealed that she had normal strength and full range of motion in her lower extremities. (*Id.* at 285). These findings "in no way support [Plaintiff's] allegation that she requires crutches to ambulate or that she consistently needs to elevate her feet above her body level." (*Id.* at 25). Further, even though Stahl testified at the July 26, 2012 hearing that she had difficulty remembering "everyday things" (*id.* at 56–57), Stahl correctly answered a series of questions posed by Dr. Karr during her September 15, 2011 examination[6] (*id.* at 348). She used public transportation to get to the appointment despite having never been to that location previously and was unaccompanied. (*Id.*at 346). These findings were "inconsistent with [Plaintiff's] allegations of significant memory deficits and problems with focus and concentration," and they did not "support the necessity of notes to help with memory." (*Id.* at 28).

---

[6] The following is part of Dr. Karr's summary of the questioning:

> She gave her birthdate correctly and stated for her upcoming birthday she wants to stay home. She gave the current date correctly . . . .

> She recalled 2 of 3 items after 5 minutes ball and fishing pole; forgetting dog. She gave serial 7's correctly. She repeated 6 digits forward, 4 digits backward. She calculated 4+45, 10-6, and 6x25 correctly . . . .

(R. at 348).

As to the second manifestation of "consistency," the ALJ found that Stahl's own statements were internally inconsistent. For instance, on April 30, 2012, Stahl told Dr. Gragasin that she does not have "recurrent" neck pain. (R. at 27, 426). Two months later, on July 12, 2012, Stahl claimed that she has endured "almost constant neck pain for several years." (*Id.* at 27, 468). It was reasonable for this discrepancy to factor into the ALJ's credibility assessment. Indeed, Dr. Gragasin herself noted the inconsistency. (*Id.* at 468).

Moreover, the ALJ repeatedly noted Stahl's inconsistent statements regarding her consumption of alcohol. (R. at 25, 27, 28, 30). At the July 26, 2012 hearing, Stahl testified that she does not drink alcohol, that she stopped drinking socially in 2009 or 2010, and that she has never been an "alcoholic." (*Id.* at 54). In fact, she said she is not allowed to drink due to her medication. (*Id.*). But according to February 21, 2011 treatment notes, Stahl reported that she drinks alcohol two times per month. (*Id.* at 25, 308). On August 25, 2011, Stahl told Dr. Hall-Ngorima that she consumes six to seven beers per week. (*Id.* at 27, 419). On May 22, 2012, Dr. Gragasin "[a]dvised [Stahl] to stop drinking alcohol"—advice that suggests that Stahl had been drinking throughout this time period. (*Id.* at 27, 428). These inconsistencies "undermine[d] the veracity of [Plaintiff's] overall statements and motivation." (*Id.* at 30).

Moreover, the ALJ found that Stahl inconsistently described the purported side effects of her medications. (R. at 29). At the hearing, Stahl described her medications as "horrible" and stated that she endures side effects such as memory loss and

a poor appetite. (*Id.* at 52, 55–57). However, the ALJ cited two of Stahl's appointments with Dr. Hall-Ngorima—one from November 15, 2011, and the other from February 21, 2012—where Stahl reported having no side effects.[7] (*Id.* at 29, 383, 442).

And as to the third manifestation of "consistency," the ALJ found that Stahl's allegations were inconsistent with other information in the case record. Specifically, the ALJ determined that Stahl and her sister, Mary Fahey, contradicted each other in several respects. (R. at 24). For example, whereas Fahey testified during the hearing that Stahl has no friends, Stahl told Dr. Karr on September 15, 2011, that she spoke to friends on the phone twice per week. (*Id.* at 28). Similarly, whereas Fahey testified that Stahl's son did not provide her any help, Stahl testified that her son did a "great deal" for her. (*Id.* at 28, 59).

Stahl contends that the ALJ "improperly" made a determination that Stahl required more treatment. (Dkt. 17 at 8, 10). According to the ALJ, Stahl's "limited treatment with frequent gaps fail[ed] to support symptoms precluding her frequent use of her upper extremities, despite any recently noted nerve impingement." (R. at 27). Elsewhere in the decision, the ALJ noted:

---

[7] Stahl contends that the ALJ erroneously undermined her credibility because she did not complain about medication side effects *enough* when Seventh Circuit law states that she does not have to complain about side effects at all. (Dkt. 17 at 11) (emphasis in original). But the ALJ discredited her testimony not because she did not complain enough about her side effects but rather because her complaints were not consistent. (*Compare* R. at 52, 55–57 (testifying to side effects, including memory loss and poor appetite) *with id.* at 29, 383, 442 (reporting *no* side effects to her doctor)).

> After [Stahl's] emergency room presentation [on July 30, 2010], the record does not support any treatment until February 21, 2011, over six months later. This gap in treatment is indicative that her symptoms and conditions were not as severe and debilitating as . . . alleged. I understand that [Plaintiff] lost her insurance, but [Plaintiff] was able to get emergent treatment and obtain information for future treatment at her presentation in July of 2010. Hence, [Plaintiff] knew that if she had exacerbation of symptoms that she could obtain treatment at the emergency room.

(*Id.* at 25). Stahl contends that the ALJ's inference was improper because Stahl was destitute during the relevant period and, presumably, could not afford any additional treatment. Similarly, Stahl claims that, as a mentally impaired claimant, any noncompliance with her medication was immaterial.

In the Seventh Circuit, "infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Craft v. Astrue*, 539 F.3d 668, 678–79 (7th Cir. 2008); *see* SSR 96-7p. Prior to drawing a negative inference about a claimant's symptoms and their functional effects from a failure to attain certain treatment, however, the ALJ must first consider any explanations that the individual may provide or other explanatory information in the case record. SSR 96-7p; *see Craft,* 539 F.3d at 678–79 ("An inability to afford treatment is one reason that can 'provide insight into the individual's credibility.'") (citing SSR 96-7p).

Here, the ALJ's negative credibility inferences were reasonable because the ALJ considered "other explanatory information in the case record." *See* SSR 96-7p. As to the gap in Stahl's treatment during the six months leading up to February 21, 2011, the ALJ acknowledged that Stahl had lost her insurance coverage. (R. at 25, 284).

The ALJ then noted that, in July 2010, Stahl received emergency medical treatment and was provided information about "services available to assist in obtaining medications and care." (*Id.* at 25, 287). In effect, the ALJ did consider Stahl's financial constraints but nonetheless came to the reasonable conclusion that her failure to obtain treatment in "any . . . medical facility" suggested that her symptoms were not as severe as alleged. (*Id.* at 25).

Stahl also criticizes the credibility assessment to the extent that the ALJ "mischaracterized" certain pieces of evidence. *See Terry v. Astrue*, 580 F.3d 471, 477–78 (7th Cir. 2009) (an ALJ's credibility assessment must be supported by the record). The evidence in question pertains to two reports completed by Dr. Hall-Ngorima that were dated August 21, 2011, and July 26, 2012, respectively. First, as to the 2011 report, the ALJ purportedly "mischaracterized" this evidence by opining that the report was "vastly inconsistent" with Stahl's testimony. (R. at 20). Stahl's argument is unpersuasive, however. Dr. Hall-Ngorima noted that Stahl "was running [a] day care in her home until last yea[r, 2010]" (*id.* at 418), while, at the hearing, Stahl stated that her 2010 work entailed looking after her nephew's children, one night per week (*id.* at 50–51). It was not a "mischaracterization" for the ALJ to suggest that *running a day care* is not the same thing as *looking after one's own family one night per week.*

Stahl also contends that the ALJ "mischaracterized" the July 26, 2012 report by claiming that it was from July 26, 2011. Stahl correctly points out that the ALJ erred as to the correct year of the report, but Stahl has failed to explain the import

of the error, noting only that it "denied Plaintiff the logical and accurate determination to which she is entitled." (Dkt. 17 at 10). The party seeking to overturn an agency's administrative decision generally bears the teburden of demonstrating how any error would have made a difference to her claim. *Shinseki v. Sanders*, 556 U.S. 396, 399–413 (2009).

Finally, Stahl asserts that her noncompliance with medication "is immaterial because people with serious mental impairments are often unable to take their medications consistently." (Dkt. 17 at 10). Indeed, the Seventh Circuit has cautioned ALJs against placing too much weight on the noncompliance of a mentally impaired claimant. *See Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) ("[P]eople with serious psychiatric problems are often incapable of taking their prescribed medications consistently."). Nevertheless, even if the ALJ erred in this regard, she provided sufficient evidence to support her credibility determination, as discussed above. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (While ALJ improperly discredited claimant's testimony regarding effects of chronic pain, the credibility determination was affirmed because the ALJ provide "some evidence supporting her determination.").

Moreover, the ALJ did accommodate many of Stahl's reported limitations:

> I reduced [Plaintiff] to light work to accommodate her obesity, cervical disk disease and neuropathy with pain and stiffness in her hands and feet. I added additional postural limitations to accommodate [Plaintiff's] subjective functional difficulties with physical maneuvers. I specifically considered her cervical findings and neuropathy when I limited [Plaintiff] to frequent over constant use of her bilateral upper extremities for fine and gross manipulation. I considered her reported poor concentration and focus and limited her to no more than occasion-

al concentrated exposure to hazards, I considered her depression and anxiety disorder with reduced memory and concentration when limiting her to simple, routine and repetitive work. . . . I considered her social phobia in providing limitations with co-workers and the public.

(R. at 30). While Plaintiff has demonstrated severe impairments, the ALJ properly found that the medical evidence in this case fail to provide support for Stahl's allegations of disabling symptoms and limitations. (R. at 25). In sum, the Court concludes that the ALJ's credibility determination was not "patently wrong." *See Craft*, 539 F.3d at 678. The ALJ's credibility finding was supported by substantial evidence and was specific enough for the Court to understand the ALJ's reasoning. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Skinner*, 478 F.3d at 845.

## B. Treating Physicians

Stahl contends that the ALJ improperly rejected the opinions of Dr. Hall-Ngorima, her treating mental health physician, and Dr. Pillai, her treating physician. (Dkt. 17 at 13–14). Stahl argues that Dr. Pillai's opinion was entitled to controlling weight because it was supported by the medical evidence. (*Id.* 13). Stahl also contends that the ALJ failed to consider Dr. Hall-Ngorima's opinion that Stahl is unable to work. (*Id.* 14).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord*

*Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

### 1. *Dr. Hall-Ngorima*

On February 3, 2012, Dr. Hall-Ngorima completed a one-page medical inquiry for the Township of Worth regarding Stahl's application for general assistance. (R. at 390). Dr. Hall-Ngorima diagnosed social phobia and depression. (*Id.*). She opined that Stahl "is currently unable to work due to severity of social phobia which keeps her from leaving the home." (*Id.*).

In her decision, the ALJ declined to give controlling weight to Dr. Hall-Ngorima's opinion:

> I cannot give controlling or great weight to the treating mental health opinion of Dr. Hall-Ngorima as I find her opinion inconsistent with her own treatment record, the overall treatment record, which consists of minimal treatment and some non-compliance, and [Plaintiff's] improved condition with medications. I give Dr. Hall-Ngorima's opinion little weight as I find it contrast to [Plaintiff's] activities as well as her ability to go out alone for appointments and go shopping. Her opinion appears to be based upon [Plaintiff's] subjective complaints alone. [Plaintiff] has shown improvement with medications that she recently started. I do not find Dr. Hall-Ngorima's opinion that [Plaintiff] is unable to work due to severe social phobia that is expected to last greater than 12 months is supported in the record especially in light of [Plaintiff's] improvement with minimal treatment. Moreover, the opinion of inability to work is one reserved for the Commissioner.

(R. at 31) (citations omitted).

Stahl contends that the ALJ failed to consider Dr. Hall-Ngorima's opinion, rejecting it only because it dealt with a matter—disability—reserved for the Commissioner. (Dkt. 17 at 14). On the contrary, the ALJ identified substantial evidence for giving little weight to Dr. Hall-Ngorima's opinion. Dr. Hall-Ngorima's own treatment notes contradicted her opinion. Stahl showed symptom improvement despite going months in between her appointments with Dr. Hall-Ngorima. (R. at 442, 445, 447, 450, 457). Plaintiff went to all of her appointments alone, which belies Dr. Hall-Ngorima's conclusion that Stahl's social phobia prevents her from leaving the home. (*Id.* at 442, 447, 457). Plaintiff was often noncompliant with her medications, with no ill-effect noted. (*Id.* at 448, 450, 458). On February 2, 2012, the day before she completed her opinion for Township of Worth, Dr. Hall-Ngorima concluded that Stahl was improving with medication. (*Id.* at 442–46).

## 2. *Dr. Pillai*

On November 28, 2011, Dr. Pillai completed a medical source statement. (R. at 275–76). Dr. Pillai opined that Stahl could lift less than 5 pounds and was limited to standing and walking less than 1 hour in an 8-hour workday and limited to sitting less than 2 hours in an 8-hour workday. (*Id.* at 275).

In her decision, the ALJ gave Dr. Pillai's[8] opinion "very little weight":

> Dr. Pillai provided extreme limitations in lifting, walking, standing and sitting that are not supported in the overall record and [Plaintiff's] objective clinical findings throughout the evidence. [Plaintiff] had minimal and conservative treatment only with some non-compliance with taking her medications without significant exacerbations documented. It appears that Dr. Pillai made her opinion based upon [Plaintiff's] subjective responses only as demonstrated by Dr. Pillai's use of "average 4 days out of week, I have some type of pain." Additionally, Dr. Pillai did not provide any details from clinical findings to support her opinion and excessive limitations.

(R. at 31) (citations omitted).

Stahl contends that Dr. Pillai's opinion was entitled to controlling weight because a July 2012 CT scan showed foraminal narrowing from C2–C7 and bilateral changes at C6-C7. (Dkt. 17 at 13–14). On the contrary, the ALJ provided clear reasoning, supported by substantial evidence for giving little weight to Dr. Pillai's opinion. To be afforded controlling weight, medical opinions need to be based on tests and observations, and not amount merely to recitation of a claimant's complaints. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Here, Dr. Pillai parroted Plaintiff's complaints of pain. (R.

---

[8] The ALJ inadvertently refers to Dr. Pillai as "Dr. Pilla." (*Compare* R. at 31 *with id.* at 275).

at 275). Plaintiff posits that Dr. Pillai's November 2011 opinion is supported by a July 2012 CT scan. (Dkt. 17 at 13–14). But the tests and observations that support Dr. Pillai's opinion cannot possibly *postdate* her opinion by 8 months. Dr. Pillai contends that her opinion is supported by vague August 2011 findings but provides no details to explain how such findings support her extreme limitations in lifting, walking, standing and sitting. (R. at 276). Moreover, after reviewing the medical records, Dr. Andrews, a state agency consultant, found no objective medical evidence to support Dr. Pillai's limitations. (*Id.* at 411; *see id.* at 31 (ALJ giving some weight to Dr. Andrews's opinion)).

In sum, the ALJ provided sound reasons, supported by substantial evidence, for giving Drs. Hall-Ngorima's and Pillai's opinions little weight. The medical evidence does not support the extreme limitations opined by Drs. Hall-Ngorima and Pillai.

## C. RFC Assessment

The ALJ determined that Stahl's major depressive disorder, alcohol abuse, anxiety disorder, diabetes with neuropathy, and degenerative disc disease of the cervical spine are severe impairments. (R. at 20). After examining the medical evidence and giving partial credibility to some of Stahl's subjective complaints, the ALJ found that Stahl has the RFC to perform a limited range of light work.[9] Stahl contends

---

[9] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

that the ALJ erred in this determination by failing to consider evidence of her tremors. (Dkt. 17 at 12–13).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft*, 539 F.3d at 676. In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; *see* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court finds that the ALJ's determination of Stahl's RFC was thorough, thoughtful, and fully grounded in the medical evidence, including physicians' opinions and Stahl's testimony. On August 25, 2011,

Stahl complained to Dr. Hall-Ngorima of a head tremor that prevents her from going to the doctor, getting her hair done, and going on job interviews. (R. at 418, 450). Less than a month later, however, Dr. Karr did not observe any signs of tremors, motor restlessness, or any other physical discomfort. (*Id.* at 348). Nor did Stahl complain to Dr. Karr of any problems with tremors. (*Id.* at 346–49). Moreover, in Dr. Hall-Ngorima's February 2012 report to the Township of Worth, opining that Stahl was unable to work, Dr. Hall-Ngorima made no mention of tremors. (*Id.* at 390). Although Dr. Hall-Ngorima observed a "fine tremor" on July 26, 2012, she found Stahl to be alert and oriented, in no acute distress. (*Id.* at 459). Dr. Hall-Ngorima did not include the tremors in her diagnosis, did not prescribe any medications for the tremors, and merely scheduled Stahl for a routine follow-up visit in two months. (*Id.*).

In a June 20, 2012 report to the Social Security Administration, Plaintiff complained that clonazepam caused trembling side effects. (R. at 257). And at the June 26, 2012 hearing, she testified about her tremors and its accompanying symptoms. (*Id.* at 66–67). But on July 26, 2012, Stahl denied any side effects from her medications. (*Id.* at 457). And as discussed above, the ALJ properly found Stahl not credible.

The ALJ explicitly evaluated all this evidence (R. at 20, 28, 31) and concluded that the tremors were nonsevere (*id.* at 20). Nevertheless, the ALJ took them into consideration in assessing Stahl's RFC. (*Id.* at 20). In sum, the Court finds that the ALJ did not err in his determination of Stahl's RFC. The ALJ fulfilled her responsi-

bility to determine Stahl's RFC after weighing the medical source statements and other evidence in the record. *See* SSR 96-5p, at *2 (the determination of an individual's RFC is not a medical issue; instead, it is an administrative finding dispositive of a case), *5 (The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, . . . an individual's own statement of what he or she is able or unable to do, and many other factors that could help the [ALJ] determine the most reasonable findings in light of all the evidence."). Substantial evidence supports the ALJ's determination that Stahl can perform a limited range of light work.

## VI. CONCLUSION

For the reasons stated above, Stahl's Motion for Summary Judgment [16] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is **AFFIRMED**.

E N T E R:

Dated: January 20, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge